FILED

01 FEB 23 AM 10: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

FEB 23 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

HUGHES EASTERN CORPORATION, )
)
)
Plaintiff, )
) CIVIL ACTION NO.
v. )
) 00-AR-972-J
SAMSON RESOURCES COMPANY, )
)
Defendants. )
)

### MEMORANDUM OPINION

Before the court is the motion for summary judgment of defendant Samson Resources Company ("Samson") and defendant's motion for attorney's fees. Plaintiff, Hughes Eastern Corporation ("Hughes"), alleges that Samson is in breach of contract. Hughes has sued for specific performance of the contract and has requested a declaratory judgment regarding the parties' contractual rights and obligations. For the reasons set forth below, defendant's motion as to plaintiff's specific performance claim is due to be granted. As a consequence, the court will dismiss without prejudice plaintiff's action for a declaratory judgment to the extent that the court has not determined or described the parties' contractual relationship in resolving Hughes's specific performance claim. Samson's motion for attorney's fees will be denied.

30

**Background**

I. <u>Pertinent and Undisputed Facts</u>

This dispute concerns a joint operating agreement ("JOA") governing the production of gas from mineral acreage in Lamar County, Alabama. The JOA at issue is a 1982 standard form joint operating agreement crafted by the American Association of Petroleum Landmen ("AAPL"). Under the JOA, one party owning an interest in that acreage, designated in the JOA as the "Contract Area", acts as the Operator and, as such, is responsible for the day-to-day field operations. Various JOA provisions spell out specific rights and obligations of the Operator. All other parties to the JOA, the Non-Operators, likewise have rights and responsibilities pursuant to the JOA.

Several of the rights of the Non-Operators involve their relationship with the Operator. Article V.A states that the Operator "shall conduct all ... operations [called for under the JOA] in a good and workmanlike manner, but it shall have no liability ... to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct." Non-Operator rights also include the capacity to remove the Operator and to select a successor

Operator under Articles V.B.1 and V.B.2. V.B.1 provides that when an Operator sells its interest in the Contract Area, it is deemed to have resigned and the Non-Operators are called upon to elect a successor Operator. In addition, V.B.1 allows for removal of an Operator "if it fails or refuses to carry out its duties hereunder." Ouster is effectuated by an affirmative vote for removal by two (2) or more Non-Operators owning a majority interest (after subtracting the voting interest of the Operator) in the Contract Area. Whether the Operator resigns or is removed, the selection of a successor Operator must take place pursuant to Article V.B.2. Under this provision, the successor Operator must have an interest in the Contract Area and receive the affirmative vote of two (2) or more parties owning a majority interest, with the Operator's voting interest subtracted if it fails to vote or votes to succeed itself.

From the JOA's execution on October 1, 1983, until 1994, Southland Royalty Company ("Southland") was the Operator for the Contract Area. In 1994, Samson acquired Southland's interest and assumed Operator duties. Although the Non-Operators did not designate Samson as the Operator as provided for under V.B.1 and V.B.2, they treated Samson as such, with all the rights and responsibilities associated with the position. The record reveals dissatisfaction with Samson's performance by some Non-Operators,

3

including Hughes, owner of a 0.01171352% interest in the Contract Area, and to a decidedly lesser extent, Southwest Royalties, Inc. ("Southwest"), possessor of a 57.023% interest, but there was no challenge to Samson's Operator status until July of 1999. On the 28th day of that month, Hughes's president, Emil Pawlik ("Pawlik"), sent a letter to all of the Non-Operators that initiated a vote for a successor Operator ("the July vote"). In characterizing the procedural context of the vote, Pawlik wrote: "Article V.B.1 provides that if operator no longer owns an interest in the Contract Area then operator is deemed to have resigned and selection of a successor is provided for. According to our records, the election never occurred when Southland sold their interest [to Samson]." The letter continued: "Furthermore, the current operator, Samson Resources[,] has failed to carry out it's [sic] duties under the [JOA]...." The letter then specified eight ways in which Samson supposedly failed to carry out its Operator responsibilities. Attached to the letter was a ballot with the words "Successor Operator Election" prominently displayed in large type. Each ballot read:

> I/We _____ owner of _____% working interest in the [Contract Area] gas unit hereby vote in favor of _____ to become successor operator of the unit.

By the computation provided for under V.B.2, Hughes won this election. It duly notified Samson of its intention to take over Operator duties; however, when it requested that Samson step aside, Samson refused. During this time, Samson addressed, or sought to address, at least one of the Non-Operators' concerns, that concerning underproduction.

After Hughes became satisfied that Samson did not intend to relinquish operator control, it filed the current complaint in the circuit court of Lamar County, Alabama. Samson removed the action to this court on diversity grounds. At a hearing on the issue of subject matter jurisdiction, Samson satisfied the court that removal was proper, and the case proceeded. Since the filing of the complaint, as reflected in Pawlik's correspondence, Hughes's unhappiness with Samson's operation of the gas wells in the Contract Area has continued. Southwest, again to a lesser extent and less insistently, has also expressed dissatisfaction in the interim. Under an oral, informal agreement, Southwest has paid an unspecified portion of the legal costs for this suit; however, it is not a party to this action.

## **Summary Judgment Standard**

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be

granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has emphasized that this language means exactly what it says: there must be a genuine issue of material fact, not merely some factual dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510. What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575 (1968)).

Samson having moved for summary judgment, the court must look at the evidence, construed most favorably to Hughes, to see if a jury could return a verdict for it. If so, Samson's motion for summary judgment must be denied. If, however, as a matter of law, a jury could not return a verdict for Hughes, Samson's motion must be granted.

**Claim for Specific Performance**

Under Alabama law, the determination of whether a contract provision is free from ambiguity, and the meaning to be given unambiguous contract language, are matters of law. *See Food Service Distrib., Inc. v. Barber*, 429 So.2d 1025, 1028 (Ala. 1983). Contract language is ambiguous if it is reasonably susceptible to more than one meaning. *See Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.*, 622 So.2d 314, 317 (Ala. 1993). Because unambiguous language is taken as clear expression of the intent of the parties, if a court finds that the language is unambiguous, it enforces the contract as written. *See Loerch v. Nat'l Bank of Commerce of Birmingham*, 624 So.2d 552, 553 (Ala. 1993).

The portions of the JOA dealing with Operator removal and selection are unambiguous. That contract clearly makes resignation or removal of a current Operator a pre-requisite to selection of a successor Operator. V.B.2 begins with the sentence: "Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties." Hughes now concedes that it is Samson's, not Southland's, resignation or removal that must have occurred prior to the choice of a successor Operator.[1] Therefore, its

---

[1] If Hughes did not so concede, under *Industrial Machinery, Inc. v. Creative Displays*, 344 So.2d 743(Ala. 1977), this court would imply a waiver

7

argument for the procedural propriety of the July vote rests on viewing that one-time vote as accomplishing two things: removing Samson and selecting Hughes as Samson's replacement. The ballot's language alone is enough to place beyond dispute that the July vote was a vote to do *one* thing: choose a successor Operator according to the process established under V.B.2. Just because the letter accompanying the ballot opined that Samson had failed in its Operator duties does not make the ballot more than what it facially appears to be. Furthermore, a plain reading of V.B.1 and V.B.2 establishes that a V.B.2 vote for a successor Operator cannot be treated as a *de facto* vote to remove under V.B.1. Unless the Operator resigns, in which case only a V.B.2 vote need be held, two distinct votes must be cast: one for removal of the Operator, one for selection of its successor. This was not done. Therefore, the July vote was improper, and Samson has not been removed as Operator.

Hughes's only perceptible response to the contention (now ripened into a finding) that the July vote was not in accordance with the JOA is to contend that the Non-Operators *intended* to remove Samson by voting for Hughes. However, even if the inescapable

---

by Hughes and the other Non-Operators of their right to select a successor Operator to Southland under Article V.B.2. *See id.*, at 746 (holding that a waiver of a party's rights under a contractual provision may be implied from that party's actions).

8

meaning of V.B.1 and V.B.2 thwarts the Non-Operators' true intention of removing Samson by voting to install Hughes, under Alabama law, the solution to that conflict is not to ignore the contract language. The Non-Operators must conform to the written words of their agreement, not the other way around. Thus, guided by the clear language of the JOA, this court finds that a vote for a successor Operator where the current Operator has not previously resigned or been removed is ineffective both as to removing the current Operator and as to installing its successor.[2] What Hughes hopefully but euphemistically calls an "incorrect styling" of the July vote fails to remedy a fatal defect, preventing specific performance of the JOA insofar as Hughes seeks to obtain this court's order removing Samson as Operator. This court cannot specifically enforce a contracting party to perform a contract it has not breached.

## Claim for Declaratory Judgment

To a certain extent the court has declared Hughes's rights and obligations toward Samson under the JOA in resolving its specific

---

[2]While the court has relied on general rules of Alabama contract law in reaching this conclusion, the determination accords with *Purvis Oil Corp. v. Hillin*, 890 S.W.2d 931, 935-37 (Tex.App.--El Paso 1994), which considered identical joint operating agreement provisions under similar facts.

performance claim.  Because the court did so on the basis of contract provisions concerning procedure, it had no need to reach a substantive legal issue on which the parties disagree, namely the proper standard for Operator removal under the JOA.  Hughes asserts that the standard for removing an operator is found in V.B.1: failure or refusal to fulfill the Operator's duties as provided in the JOA.  Samson argues that Hughes would have this court apply the wrong standard; it asserts that under a standard 1982 AAPL JOA Operators can only be removed for gross negligence or willful misconduct.  It points to Article V.A, which states that an Operator "shall have no liability ... to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct."  Because this question arguably can be dispensed with through the vehicle of declaratory judgment, the court turns to whether it can, or should, exercise its declaratory power over this remaining issue.

Even though the court's jurisdiction is based on diversity and Hughes originally requested declaratory relief under state law, the Declaratory Judgment Act ("the Act") governs the availability of declaratory relief.  *See* 28 U.S.C. § 2201; *Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1332-1333 (11th Cir. 1989).  A district

court has discretion in deciding whether to use the power granted it under the Act, see *Angora Enter., Inc. v. Condo. Ass'n of Lakeside Vill.*, 796 F.2d 384, 387 (11th Cir. 1986), but should liberally construe the Act in order to fulfill its purposes of adjudicating a controversy in its early stages and avoiding multiple actions when the rights and obligations of the parties can be adequately declared in one. See *McDougald v. Jenson*, 786 F.2d 1465, 1481 (11th Cir. 1986)(citing 13B C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2752 (2d Ed.1983)). Nevertheless, liberal construction of the Act cannot extend the jurisdiction of federal courts by allowing them to hear disputes that are not cases and controversies under Article III. See *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40, 57 S.Ct. 461, 462-64 (1937); *Atlanta Gas Light Co. v. Aetna Cas. & Surety Co.*, 68 F.3d 409, 414 (11th Cir. 1995). Because the absence of a "case or controversy" equates to lack of subject matter jurisdiction, if doubt arises regarding the presence of an actual controversy at any stage of the proceedings, a court must address the issue of jurisdiction. See *Atlanta Gas Light*, 68 F.3d at 414.

In order to meet the Article III standard in the declaratory judgment context, the dispute must be "a substantial controversy, between parties having adverse legal interests, of sufficient

immediacy and reality." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). In *Maryland Casualty*, the Court recognized that this determination must be made on a case-by-case basis and that "the difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree." *Id.*, 312 U.S. at 273, 61 S.Ct. at 512. Following these guidelines, the Eleventh Circuit has held that the determinative question is not whether the liability of a party is contingent, but rather what is the "practical likelihood" of the contingencies coming to pass, thus triggering a real controversy. *See GTE Directories Publishing Corp. v. Trimen America, Inc.*, 67 F.3d 1563, 1569-1570 (11th Cir. 1995) (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2757, at 587 (2d Ed.1983)); *Hendrix v. Poonai*, 662 F.2d 719, 722 (11th Cir. 1981).

In applying these principles to the case at hand, the court must first determine what contingencies would have to occur in order for there to be an actual controversy. There are five. A controversy will arise: 1) if the Non-Operators, using the correct procedure, vote to remove Samson, 2) if the Non-Operators select Hughes as successor Operator, 3) if Hughes demands that Samson step

12

aside, 4) if Samson refuses to do so, and 5) if Hughes decides to sue for breach of contract. Future litigation involving actual coercive claims between Hughes and Samson, requiring a determination of the standard for Operator removal, will not happen if these "ifs" do not occur. Normally, then, such a determination by this court would be made only at that time. However, if the court finds that those five contingencies are all but certain to transpire, the *potential* for such future litigation is sufficiently likely that the court may now, prior to their occurrence, exercise its discretion to speak to the issue of the operator removal standard without violating the Article III controversy requirement.

Considering the contingencies in the aggregate, as it must, the court finds that the likelihood of their occurrence is not high enough to meet that standard. In particular, the court finds that a measure of uncertainty inevitably creeps into forecasting steps one and two. Hughes is all but certain to throw its 0.1171352% interest behind an effort to remove Samson and designate itself as the replacement. However, it cannot single-handedly create a dispute between itself and Samson regarding operator control because under the JOA *two* Non-Operators with a combined majority interest, after subtracting Samson's 25% interest, must vote for both Samson's

removal and Hughes's selection.  Southwest would seem a probable candidate to support Hughes, but although it has paid for some of Hughes's legal fees, amount unknown, it evidently was not moved to protect its interests in this matter, such as they are, by joining the action.  It is also true that Southwest voted to select Hughes in the July vote and has evidenced some discontent with Samson's performance since then.  However, the degree of its dissatisfaction is decidedly milder than Hughes's, and during the approximately 18 months since the ineffectual successor Operator vote, Samson has addressed, or at least attempted to address, some of the complaints contained in Pawlik's letter of July 28, 1999.  Because the court has found the July vote ineffective, Samson's subsequent efforts would factor into any Non-Operator's decision on removal and selection.  The extent of these efforts is unclear as is whether they hold any sway on Southwest.  Equally uncertain is the impact of Samson's efforts, the passage of time, and this lawsuit on the other Non-Operators and the practical influence of their current views regarding the Operator quarrel on the future actions of Southwest, Hughes, and Samson.

　　　The court points out the speculative nature of predicting future circumstances.  The fact that Hughes is the sole plaintiff in this action makes it less than a sure bet that Hughes can get the

votes it needs to unseat Samson. The court is unwilling to reach a firm conclusion as to whether Hughes is unlikely or is likely to create a justiciable controversy over the Operator removal standard at some future date. Even if it is more likely than not, the relevant question is whether it is *sufficiently likely*. The relevant contingencies here are not "almost inevitable", as the Eleventh Circuit found in *GTE Directories*, 67 F.3d at 1569, but neither are they as remote as in *Hendrix*, where the court found the "ifs" too speculative. See *Hendrix*, 662 F.2d at 722. The question is, as the Supreme Court observed in *Maryland Casualty*, one of degree, and analyzing the facts of this case, the court finds the practical likelihood insufficient to support the conclusion that an Article III controversy exists between the parties. The court is aware that clarifying the rights and obligations of the parties might serve some useful purpose in that the clarification might help them make future decisions; however, "[f]urnishing such guidance prior to the making of the decision[s] ... is the role of counsel, not of the courts." *Hendrix*, 662 F.2d at 722.

### Motion for Attorney's Fees

Samson has moved this court for the award of attorney's fees

pursuant to the Alabama Litigation Accountability Act, Ala. Code §§ 12-19-270, *et seq*. Under that Act, an award is proper if the action "is frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose." Ala. Code § 12-19-271; *see* Ala. Code § 12-19-272. Hughes's action, while not a winner, was not frivolous, therefore the motion will be denied.

### CONCLUSION

A separate and appropriate order will be entered.

DONE this 23rd day of February, 2001.

                                                  WILLIAM M. ACKER, JR.
                                                  UNITED STATES DISTRICT JUDGE